UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

_____

                                                    :
DAWN WRIGHT,                                        :
                                                    :
                            Plaintiff,              :            3:16 - CV-01835
                                                    :
            v.                                      :
                                                    :            (Hon. John E. Jones III)
CAROLYN W. COLVIN, ACTING                           :
COMMISSIONER OF SOCIAL                              :
SECURITY                                            :
                                                    :
                            Defendant.              :
_____:

## MEMORANDUM

**May 2, 2017**

The above-captioned action is one seeking review of a decision of the Acting

Commissioner of Social Security ("Commissioner"),[1] denying Plaintiff Dawn Wright's

("Wright") application for Social Security Disability Insurance Benefits ("DIB"), pursuant to 42

U.S.C. § 405(g).

Disability insurance benefits are paid to an individual if that individual is disabled and

"insured," that is, the individual has worked long enough and paid social security taxes. Wright

met the insured status requirements of the Social Security Act through September 30, 2015. (Tr.

22).[2]

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for Carolyn W. Colvin, Acting Commissioner of Social Security as the defendant in this suit.

[2] References to "Tr. __" are to pages of the administrative record filed by the Defendant as part of the Answer (Docs. 4 and 5) on November 14, 2016.

Wright filed her application for DIB under Title II of the Social Security Act ("Act"), on May 26, 2011, alleging disability beginning May 22, 2008. (Tr. 100). On August 14, 2011, Wright's application was initially denied by the Bureau of Disability Determination. (Id.). Wright filed a written request for a hearing before the Administrative Law Judge ("ALJ") Office of Disability and Adjudication and Review of the Social Security Administration, and one was held on November 7, 2012. (Id.). On February 20, 2013, the ALJ issued a decision denying Wright's application. (Tr. 100-12).

Wright appealed the decision to the Appeals Council, who reviewed the decision and entered an order on September 18, 2014, remanding the case back to the ALJ. (Tr. 118-20). A second hearing before the ALJ was held on January 15, 2015. (Tr. 20). At the hearing, Wright was again represented by counsel and a vocational expert testified. (Tr. 68-81). On April 13, 2015, the ALJ issued a decision, again denying Wright's application for DIB. (Tr. 20-36). Wright filed a request for review before the Appeals Council on May 4, 2015 (Tr. 14-16), which was denied. (Tr. 1-6). Thus, the ALJ's April 13, 2015 decision stood as the final decision of the Commissioner.

Wright subsequently filed a complaint before this Court on September 6, 2016. (Doc. 1). After supporting and opposing briefs were submitted (Docs. 6 and 7), the appeal[3] became ripe for disposition. Wright appeals the ALJ's determination on three grounds: (1) whether the ALJ erred in failing to give controlling weight to Wright's treating physician's opinion; (2) whether substantial evidence supports the ALJ's credibility evaluation; and (3) whether substantial

---

[3] Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

evidence supports the ALJ's Residual Functional Capacity ("RFC") assessment.

I.    FACTS

Wright was born on July 1, 1970 and was thirty-seven years old on the alleged disability onset date; has at least a high school education and is able to communicate in English; and has past relevant work experience as a production scheduler and a price book coordinator.  (Tr. 34). She alleges disability due to rheumatoid arthritis, Raynaud's disease, fibromyalgia, chemical sensitivities, colitis, depression, celiac sprue, gastritis and gastroparesis.  (Tr. 217, 222-24).

    A.    Wright's Impairments

Wright presented to Dr. Robert G. Sanford in 2006 for an evaluation of widespread aches and pains.  (Tr. 291).  On exam, Dr. Sanford noted tender points in the bellies of many muscles, consistent with the trigger points of fibromyalgia.  (Id.).  Dr. Sanford treated Wright's fibromyalgia syndrome and Raynaud's phenomena through 2008 with medication, physical therapy and counseling.  (Tr. 317).

Wright stopped treating with Dr. Sanford, and on December 15, 2010, she began treatment with Dr. Douglas Charles.  (Tr. 425).  Dr. Charles noted that Wright reported widespread pain related to fibromyalgia.  (Id.).  After reviewing blood work which showed a mildly high rheumatoid factor, Dr. Charles referred Wright to rheumatologist Dr. Shirley Albano-Aluquin.  (Tr. 422-23).

Dr. Albano-Aluquin of Penn State Hershey Medical Center first saw Wright on January 14, 2011.  (Tr. 448).  Dr. Albano-Aluquin's notes from that first visit provide that Wright has chronic pain with no pain-free days and severe fluctuations a few times a week; that in 2008, Wright started having stiffness and pain in both ankles which is aggravated by cold and damp

weather, physical activity, and prolonged sitting or standing; and that she has morning stiffness in her ankles. (Tr. 448-49). On physical examination, there were no palpable lumps and Raynaud's was not indicated. (Tr. 449). Wright's gait was normal but there was a mild increase in her rheumatoid factor. (Id.). Dr. Albano-Aluquin prescribed Plaquenil and Flexeril and scheduled a follow up in four months. (Tr. 449-50).

Wright returned to Dr. Albano-Aluquin for rheumatology follow up on May 10, 2011. (Tr. 444). Dr. Albano-Aluquin noted that Wright's x-rays were nonrevealing except for mild osteoarthritis like changes; her CCP antibody was negative; and that despite her being on hydroxychloroquine for mild inflammatory arthritis, she noticed increased pain in her wrists and elbows and continued to have a lot of pain in her heels and Achilles tendon. (Id.). On physical examination, Wright's gait was antalgic with pain in the heel and toe walk; spine showed some paraspinal muscle tenderness in lumbar spine; soft tissue exam showed 8 of 18 tender points; and peripheral joint exam showed bilateral elbow joint and wrist tenderness. (Tr. 445). Dr. Albano-Aluquin noted that Wright had increased polyarhralgia symptoms, tendinitis symptoms of the Achilles tendon, and plantar fascia, which is indicative of a more active or potent inflammatory arthritis, likely from rheumatoid or spondylarthritis. (Id.). Dr. Albano-Aluquin prescribed a low dose of methotrexate, ordered a MRI, and scheduled a follow up visit in three to four months. (Id.).

On May 26, 2011, the MRI findings of Wright's lower extremities showed mild findings but no erosive changes. (Tr. 432-34). A September 14, 2011 follow up with Dr. Albano-Aluquin revealed that Wright was still complaining of severe pain in her neck, wrists, and ankles. (Tr. 535). She noted that her morning stiffness improved with the methotrexate. (Id.).

On physical examination, Wright's gait was antalgic and heel and toe walk were painful. (Tr. 536).

On January 17, 2012, Dr. Albano-Aluquin again saw Wright for her rheumatology follow up. (Tr. 812). Dr. Albano-Aluquin's notes provide that Wright's pain control plateaued in the last four or five months. On physical examination, Wright's gait was normal but she showed paraspinal muscle tenderness and tenderness on the elbows and the hands with no significant swelling. (Tr. 813). A May 15, 2012 appointment indicated persistent pain in Wright's hand, elbows, feet, and knees. (Tr. 900). On examination, Dr. Albano-Aluquin noted a slightly stiff gate with good heel and toe walk. (Id.). Her range of motion was good. (Id.). Wright received injections in her knee for acute bursitis and her methotrexate was increased. (Tr. 900-01).

Wright returned to Dr. Albano-Aluquin on August 29, 2012. (Tr. 943). A musculoskeletal exam showed an antalgic gait bilaterally; spine showed diffuse paraspinal muscle and lower lumbar facet joint tenderness; her SI joints were tender bilaterally with some mild limitation of motion; and peripheral joints showed tenderness of both elbows, wrists, knees, as well as ankles. (Tr. 943).

A December 7, 2012 follow up with Dr. Albano-Aluquin showed a moderate improvement of joint pains since an increase of the methotrexate, but significantly more fatigue. (Tr. 957). Her chronic migraine headaches also improved with medication. (Id.). Dr. Albano-Aluquin lowered the dose of methotrexate in order to combat the fatigue. (Id.). Wright's follow up appointment on May 2, 2013 indicates that her methotrexate was stopped due to liver function test abnormalities and started Enbrel injections once a week. (Tr. 1019). However, these injections were stopped due to a delayed-type hypersensitivity. (Id.). Wright reported that she

was doing better with the change of season but that she experienced mild to moderate pain over her ankles and right knee.  (Id.).  Wright reported that she was taking care of her 14 month old baby and walked her around every day.  (Id.).  Dr. Albano-Aluquin provided that Wright's joints overall are not bad considering that she is off the methotrexate and Enbrel altogether.  (Id.).  To address her right knee pain flare up, Dr. Albano-Aluquin injected the knee with Kenalog.  (Id.).  Dr. Albano-Aluquin scheduled a follow up in five months and did not prescribe any medication. (Id.).

At Wright's October 4, 2013 appointment, Dr. Albano-Aluquin observed that the Kenalog injection to Wright's right knee provided mild relief.  (Tr. 1017).  However, severe pain in her small and medium joints continued, prompting Dr. Albano-Aluquin to restart methotrexate.  (Id.).  Dr. Albano-Aluquin noted that Wright's joints have improved over the feet, especially her ankles.  (Id.).  On examination, Dr. Albano-Aluquin documented an antalgic gait, and mildly tender spine, elbow joints, knees, and ankles.  (Id.).

Wright's final date of treatment in the record with Dr. Albano-Aluquin was October 14, 2014.  (Tr. 1008).  On physical examination, Dr. Albano-Aluquin noted that Wright's gait was normal and her heel and toe walk were normal.  (Id.).  She had mild tenderness in the spine, subacromial bursa, pes anserine bursa of the right knee, and mild tenderness of the ankles and MCP's with synovial thickening.  (Id.).  Wright's medications were adjusted, otherwise, Dr. Albano-Aluquin provided that she will keep the regimen the same as it has afforded a lot of relief and enabled Wright to perform all her activities and function.  (Tr. 1009).

**B.     Residual Functional Capacity Assessments**

On January 6, 2011, Dr. Douglas Charles, Wright's primary care doctor, examined her

and opined that she was able to provide childcare services. (Tr. 406). His physical examination of Wright revealed no tenderness in the bilateral upper and lower extremities, no instability, and full range of motion. (Tr. 420).

On June 22, 2011, Dr. David Mize, Wright's gastroenterologist, completed a medical source statement with regard to her ability to perform work related physical activities. (Tr. 471-72). Dr. Mize opined that she had no functional limitations, but should avoid fumes, odors, dust and gases. (Tr. 471-72).

On July 24, 2011, Wright was seen by consultative examiner David F. O'Connell, Ph.D. Dr. O'Connell reported normal mental status findings, noting only a constricted affect and blunted mood. (Tr. 516). Dr. O'Connell assessed Wright with a GAF score of 39 and opined that Wright had none to moderate limitations in all areas except for responding to pressures or changes in a routine work setting, where he noted that these were marked. (Tr. 516, 518-19).

On August 5, 2011, Naomi Scearce, M.D., performed a consultative physical examination and thereafter, filled out a range of motion chart and medical source statement. (Tr. 520-25). Dr. Screace indicated normal examination findings with no deficits noted except for slight reductions in range of motion and strength in lower extremity strength reported and in her upper extremities. (Id.). Dr. Scearce opined that Wright could stand/walk one to two hours and sit six hours with alternating sit/stand at her option in an 8-hour day. (Tr. 521). Dr. Scearce also opined that Wright could occasionally bend, kneel, stoop, crouch, balance, and climb and had no limitations in reaching, handling, fingering, or feeling. (Tr. 522). She found that Wright could frequently lift/carry 2-3 pounds and occasionally lift/carry 10 pounds. (Tr. 521). Finally, Dr. Scearce opined that Wright had environmental restrictions to temperature extremes, chemicals,

fumes, and humidity.  (Tr. 522).

On August 9, 2011, state agency physician Roberta Gieringer, M.D., provided a physical residual functional capacity assessment after reviewing the records.  Dr. Gieringer opined that Wright could occasionally lift/carry 10 pounds, and frequently lift/carry less than 10 pounds. (Tr. 89).  He opined that she could stand/walk for a total of two hours and sit for a total of six hours in an 8-hour work day; and push/pull an unlimited amount, other than that shown for her lift/carry.  (Id.).  With regard to Wright's postural limitations, Dr. Gieringer opined that she can frequently climb ramps and stairs and stoop; could occasionally balance, kneel, crouch, and crawl; and could never climb ladders, ropes or scaffolds.  (Id.).  Dr. Gieringer stated that Wright has no manipulative, visual, or communicative limitations.  (Id.).  Dr. Geiringer also opined that Wright should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation.  (Tr. 91).

On August 10, 2011, state agency psychologist Michael Suminski, Ph.D., provided a mental residual functional capacity assessment after reviewing the records.  Dr. Suminski opined mild limitations to social functioning, moderate limitations to concentration, pace or persistence, and no episodes of decompensation.  (Tr. 87-88, 92-93).  Dr. Suminski also opined that Wright had moderate limitations to her activities of daily living.  (Tr. 88).

Lastly, Dr. Albano-Aluquin provided several opinions relevant Wright's physical abilities.  On August 29, 2012, Dr. Albano-Aluquin provided a letter to Wright's attorney, summarizing her health and limitations.  (Tr. 943-44).  In this letter, Dr. Albano-Aluquin provides that Wright can barely sit more than 45 minutes to an hour without needing to stand up and that this is the same for walking and standing for which she can only tolerate about one hour

or less of activity. (Tr. 943). Dr. Albano-Aluquin further provided that Wright has difficulty with kneeling, and difficulty writing and typing for more than 15 to 20 minutes. (Id.). Dr. Albano-Aluquin also opined that Wright continues to have a lot of fatigue. (Id.). In closing the letter, Dr. Albano-Aluquin provided that Wright has severe chronic mixed pain that impairs her functional status and precludes sustain gainful employment. (Tr. 944).

Accompanying her letter, Dr. Albano-Aluquin also completed a severity of individual's physical impairment form. (Tr. 935-942). She opined that Wright could sit, stand and walk for one hour at a time. (Tr. 937). Dr. Albano-Aluquin also opined that Wright could use her hands for handling for 45 minutes in an 8-hour day, finger for 60 minutes and feel for 60 minutes. (Tr. 938-39).

On April 12, 2013, Dr. Albano-Aluquin also completed an arthritis residual functional capacity form. (Tr. 945-49). She opined that Wright's pain would frequently interfere with her attention and concentration. (Tr. 946). Dr. Albano-Aluquin stated that Wright could walk approximately four city blocks without rest or severe pain; could sit at one time for 45 minutes; and could stand for 30 minutes at one time. (Tr. 947). Dr. Albano-Aluquin opined that Wright could sit and stand/walk a total of less than two hours in an 8-hour work day and would need the ability to walk around during an 8-hour work day for five minutes at a time. (Tr. 947). She further opined that Wright would require a sit/stand option at will and would require unscheduled breaks throughout the day, and the breaks would be for 10-30 minutes and would occur at least two times per day but could reach as many as five times a day. (Tr. 948). Dr. Albano-Aluquin also opined that Wright would have significant limitations with repetitive reaching, handling and fingering, with her ability to use her hands, finger and arms only 20

percent of the work day. (Tr. 949). Finally, Dr. Albano-Aluquin opined that Wright would be consistently absent from work four days per month. (Id.).

### C. The Administrative Hearing

On January 15, 2014, a second administrative hearing was conducted after the case was remanded back to the ALJ from the Appeals Counsel. (Tr. 69-81). At the hearing, Wright testified that she had not worked since the last hearing (Tr. 72), that she has continued to experience migraine headaches which she now receives shots for (Tr. 73), and that she continues to have swelling in her hands, especially her right hand and knuckles. (Tr. 74).

After this short testimony, Patricia Tularey, an impartial vocational expert, was called to give testimony. (Tr. 74). The ALJ asked Ms. Tularey to assume a hypothetical individual with Wright's age, education, and past work experience, and that this individual retained a capacity to perform sedentary work. (Id.). However, sedentary work is limited to occasional bilateral upper extremity pushing or pulling, occasional climbing, balancing, stooping, kneeling, crouching, and crawling but never on ladders; there should be no bilateral overhead reaching; there would be a need to avoid temperature extremes, humidity, vibration, fumes, and hazards; and the individual would be further limited to simple, routine tasks, low stresses defined as only occasional decision-making required and only occasional changes in the work setting. (Tr. 75-76).

Ms. Tularey opined that, given these restrictions, the hypothetical individual would be unable to perform Wright's past relevant work. (Tr. 76). However, the individual would be capable of performing three jobs that exist in significant numbers in the national economy: order clerk, records clerk, and information clerk. (Id.). Ms. Tularey testified that, if an individual were further limited in that she would require breaks in excess of the normal two per day plus

lunch and/or may require unscheduled breaks throughout the day at varying lengths, and/or may be reasonably expected to be off task 20 percent of the day, the individual would be unemployable. (Tr. 76-77).

## II.   DISCUSSION

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Pierce v. Underwood, 487 U.S. 552, 656, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed. 2d 131 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp.v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the

evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981).

The plaintiff must establish that there is some "medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period." <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38-39 (3d Cir. 2001) (quoting <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999)) (internal quotations omitted). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" <u>Fargnoli</u>, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)). The Commissioner follows a five-step inquiry pursuant to 20 C.F.R. § 404.1520 to determine whether the claimant is disabled. In <u>Plummer</u>, the United States Court of Appeals for the Third Circuit set out the five-steps:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.]1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987) . . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four

requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See, [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

Plummer, 186 F.3d at 428.

A.      **The ALJ's Evaluation of the Treating Physician Opinion**

On appeal, Wright argues that the ALJ erred in failing to accord controlling weight to the treating source opinion of Dr. Albano-Aluquin as expressed in her residual functional capacity assessment form. The Commissioner asserts that the ALJ gave sufficient reasons for discounting this opinion.

The preference for the treating physician's opinion has been recognized by the Third Circuit. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physicians's opinion, "the ALJ may choose whom to credit in his or her analysis, but cannot reject evidence for no reason or for the wrong reasons." Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)). In choosing to reject a treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments,

speculation or lay opinion.  Plummer, 186 F.3d at 429; Morales, 225 F.3d at 317-18.

Further, when assessing competing views of treating and non-treating physicians, the

ALJ and this court are cautioned that:

> [A]n ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence.  When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reasons or for the wrong reasons.  The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.  Treating physicians' reports should be accorded great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.  An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.

Plummer, 186 F.3d at 429 (internal citations and quotations omitted).

The ALJ accorded limited weight to Dr. Albano-Aluquin's August 29, 2012 letter

wherein she opined: that Wright can barely sit more than 45 minutes to an hour without needing

to stand up and that this is the same for walking and standing for which she can only tolerate

about one hour or less of activity; that Wright has difficulty with kneeling, and difficulty writing

and typing for more than 15 to 20 minutes; that Wright continues to have a lot of fatigue; and

that Wright has severe chronic mixed pain that impairs her functional status and precludes

sustain gainful employment.   (Tr. 943-44).  The ALJ reasoned that the letter was based on

Wright's self-reported limitations and that the examination findings set forth in the letter were

not consistent throughout the record as a whole or even in Dr. Albano-Aluguin's treatment notes,

and were not consistent with the level of treatment that Wright has received.  (Tr. 32).  The ALJ

provided that "while the clinical evidence shows some level of limitations, the overall clinical

findings, diagnostic evidence and treatment history are not consistent with the extreme level of

limitation reported by Dr. Albano-Aluquin." (Id.).

With regard to Dr. Albano-Aluquin's medical source statement dated August 29, 2012 and arthritis residual functional capacity questionnaire dated April 12, 2013, the ALJ accorded little weight to these opinions. (Tr. 33). In support of the weight given to these opinions, the ALJ provided that:

> This medical source statement and Questionnaire opine a significantly less than sedentary functional capacity that ... contains no signs or laboratory findings to support each of the limitations. While subjective complaints are noted in the Questionnaire to support the limitations, actual objective or laboratory findings are not set forth by the doctor to support each of these limitations. These opinions describe an individual with little or no useful function, and one would expect that someone with such a limitation to function would have significant longitudinal objective deficits that would be consistently reported and recorded throughout her record by her medical providers including Dr. Albano-Aluquin. However, this is not the case, as the claimant is noted longitudinally to have normal or benign findings with no significant longitudinal objective deficit findings correlated to any loss of function and certainly no longitudinal objective deficit findings that support the limitations opined by this doctor. Further, one would also expect that such an incapacitated person would require frequent monitoring and evaluation by her medical providers. However, the record does not show such medical activity here. The record shows the claimant has seen Doctor Albano-Aluquin infrequently over the last several years and once in 2014 (Exhibit 31F). Likewise, a review of the treatment from the primary doctor [Dr. Douglas Charles] shows a gap in treatment from February 2013 to February 2014 and routine conservative care for acute conditions (Exhibit 30F). Once again, the primary care doctor's records reflect normal or benign findings and do not demonstrate any consistent longitudinal objective deficits to her function that would support the limitations opined by Dr. Albano-Aluquin. As such, ... [Dr. Albano-Aluquin's] opinions [are] ... not well supported on the face of the opinion, the doctor's own records or the record as a whole.

(Tr. 33).

In further support of the ALJ's reasoning, she points to Dr. Albano-Aluquin's own treatment records which report that Wright has been taking care of her 14-month old baby, which she walks around every day and that Wright's medication regime, as adjusted, has afforded her a

lot of relief and enabled her to perform all her activities and function. (Tr. 30).

The ALJ also pointed to medical opinions and evidence from other physicians that contradicted and did not support Dr. Albano-Aluqin's opinions. For instance, the ALJ accorded significant weight to Dr. Charles's opinion, Wright's primary care doctor, whose records reflect normal or unremarkable objective examination findings, no instability and full range of motion, intact sensation and normal and equal deep tendon reflexes. (Tr. 33). Dr. Charles further opined that Wright was capable of providing childcare services. (Id.). The ALJ explained that she accorded significant weight to this opinion because it speaks to Wright's ability to perform job tasks involving the care of children and is supported directly by actual physical examination findings. (Id.).

Thus, the Court finds that the ALJ, in choosing who to credit, did not reject evidence for no reason or for the wrong reasons, nor did she make speculative inferences from medical reports; but rather, rejected the treating physician's opinion on the basis of contradictory medical evidence and adequately explained her decision to permit meaningful judicial review. Accordingly, the ALJ's decision is supported by substantial evidence.

B.     Credibility Evaluation

The ALJ is charged with the responsibility of determining a claimant's credibility. See Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." SSR 96-7p. Ordinarily, an ALJ's credibility determination is entitled to great deference. See Zirnsak

v. Colvin, 777 F.3d 607, 612 (3d Cir. 2014); Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

Further, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). Cases involving an assessment of a Plaintiff's subjective reports of symptoms "obviously [require]" the ALJ "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id.

In making this assessment, the ALJ is guided both by statue and by regulations. This guidance eschews wholly subjective assessments of a Plaintiff's symptoms. The ALJ is admonished that an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence ..., would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

Applying this statutory guidance, the Social Security Regulations provide a framework under which a Plaintiff's subjective complaints are to be considered. 20 C.F.R. § 404.1529. Under these regulations, first, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a Plaintiff's ability to perform work activities if such symptoms result

from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. § 404.1529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. Id. In so doing, the medical evidence of record is considered along with the claimant's statements. Id.

In discounting Wright's subjective testimony, the ALJ observed that Wright can perform light household chores, take care of her pet, prepare simple meals, drive, shop, pay bills, perform her own personal care, and is able to use the computer, read and watch television. (Tr. 27). The ALJ further noted that Wright has engaged in some level of babysitting and that the level of activity, gaps in treatment, rather routine and conservative treatment and Wright's normal and benign objective findings, when combined with her continued off and on again work activity and application and receipt of unemployment benefits, is not consistent with a finding of disability and undermine the credibility of her allegations. (Tr. 31). Moreover, the ALJ stated that although Wright provides that she has problems with snaps or zippers, this is inconsistent with the actual examination findings that show no specific handling, feeling, or fingering limitations. (Tr. 31). Accordingly, the Court finds that the ALJ's credibility determination is supported by substantial evidence.

### C.    RFC Assessment

Wright's final issue attacks the ALJ's RFC Assessment, arguing that the ALJ failed to place any restrictions on her ability to use her hands despite Dr. Albano-Aquin's limitations. The Commissioner responds that the ALJ did not err in failing to include additional hand

limitations to the RFC, but even if she did, it constitutes harmless error because the vocational expert identified work that Wright could perform even with such hand limitations.

The RFC reflects the most a claimant can do, rather than the least, and the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-10, 1983 WL 31251 at *12; see also SSR 96-8p, 1996 WL 374184 at *2 (recognizing an RFC represents the most that individual can do given limitations). The ALJ must then determine whether the claimant's RFC permits him to perform the full range of work contemplated by the relevant exertional level. SSR 83-10, 1983 WL 31251 at *5. "[I]n order for an individual to do a full range of work at a given exertional level the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 96-8p, 1996 WL 374184 at *3.

If the claimant's combined exertional and nonexertional impairments allow him to perform some of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent him from doing the full range of work contemplated by the exertional level. See SSR 83-14, 1983 WL 31254 at *6 ("Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision."). The "ALJ generally must accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy." Morgan v. Barnhart, 142 F. App'x 716, 720-21 (4th Cir. 2005).

Finally, an ALJ's RFC assessment must include those limitations which she finds to be credible. See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000); Hartranft, 181 F.3d at 362. Thus, to the extent that an ALJ finds some of a Plaintiff's limitations less than credible, she may properly exclude them from her RFC assessment. See e.g. Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 147 (3d Cir. 2007).

As provided for above, the ALJ specifically cited to Wright's contention that she had difficulty with snaps or zippers; however, the ALJ found that this statement was inconsistent with the actual examination findings that show no specific handling, feeling or fingering limitations. (Tr. 31). Despite this finding, the ALJ afforded Wright the full benefit of the doubt and accorded a significant decrease in exertion to sedentary, push/pull, postural, environmental and mental limitations. (Tr. 32).

Nevertheless, even if this Court were to conclude that the ALJ erred by failing to include the additional hand limitations in the RFC, such error is harmless. Foley v. Barnhart, 432 F.Supp.2d 465, 479 (M.D. Pa. 2005) (the court should affirm the ALJ's decision "if there is 'no question that he would have reached the same result notwithstanding his initial error.' ") (quoting Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994)). The error is harmless because the vocational expert testified that even with the additional hand limitations, Wright could perform the job of a video monitor, with 16,500 of those jobs existing in the national economy. (Tr. 79-80). Accordingly, the ALJ's decision will be affirmed.

III. CONCLUSION

A review of the administrative record reveals that the decision of the Commissioner is

20

supported by substantial evidence.  Accordingly, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.  An appropriate order will be entered.